DEBORAH BERNSTEIN, Appellant, v EUGENE BODEAN et al., Respondents, et al., Defendants.

Second Department, May 12, 1980

## APPEARANCES OF COUNSEL

*Fuchsberg & Fuchsberg (Bernard Turkewitz* and *Norman E. Frowley* of counsel), for appellant.

*Martin, Clearwater & Bell (Richard A. Young* and *Raymond W. Murphy* of counsel), for Eugene Bodean and another, respondents.

*Montfort, Healy, McGuire & Salley (E. Richard Rimmels, Jr.,* of counsel), for North Shore Hospital and another, respondents.

*Robert Abrams, Attorney-General (George C. Mantzoros* and *George D. Zuckerman* of counsel), appearing pursuant to section 71 of Executive Law.

## OPINION OF THE COURT

MANGANO, J.

The gravamen of this appeal concerns the question of whether the trial court, in a medical malpractice action, unduly restricted plaintiff's examination of physician members of a medical malpractice panel resulting in prejudice to plaintiff.

We hold that the trial court did not err in limiting the questions asked of the medical panelists. Accordingly, we affirm.

Deborah Bernstein began what became an extensive course of treatment in June, 1966 when defendant Dr. Bodean removed a wart from her left thumb. The other doctor defendants either treated her or, as pathologists, examined slides of matter removed from the apparent wart. After the amputation of her thumb in 1974, plaintiff's condition was diagnosed as epithelioid sarcoma, a form of cancer. As of July, 1976, the cancer had metastasized to both of Miss Bernstein's lungs.

Plaintiff commenced the instant action by service of a summons and verified complaint dated March 25, 1976.

Prior to trial, a medical malpractice panel was convened pursuant to section 148-a of the Judiciary Law. The panel was composed of a surgeon and a pathologist as well as the attorney and judicial members. The unanimous recommendation of the panel was that the defendants were free from liability. At the trial this recommendation was read to the jury in accordance with section 148-a.

Plaintiff's counsel called the two physician panelists as

witnesses, the first being Dr. Di Benedetto. Counsel then embarked upon a line of questioning relating to good medical practice and assumptions made by the panel:

"Q. Doctor, how many times do you assume that the lesion recurred while Deborah Bernstein was under the care of Dr. Bodean?

"MR. YOUNG [counsel for defendants Bodean, Kahn and Bromberg]: Objection.

"MR. MONTFORT [counsel for defendants North Shore Hospital, Basset and Littell]: Objection.

"THE COURT: I will direct him not to answer.

"Q. Doctor, did you find that there was a lesion on the left thumb and on the right thumb or only on the left thumb?

"THE COURT: The Court will direct him not to answer.

"Q. Doctor, are you of the opinion—withdrawn. Doctor, is it good practice to attempt to remove an aggressive lesion which had come back time after time?

"THE COURT: The Court will direct him not to answer since it is outside the perimeters of the statute."

Counsel for Doctors Bodean, Kahn and Bromberg began his cross-examination of Dr. Di Benedetto with questions directed toward the material submitted to the panel for consideration. Dr. Di Benedetto then testified that the material submitted was contained in two envelopes about a foot high consisting of copies of hospitalization records, examinations before trial and correspondence between the parties. The witness was then asked: "Q. Can you tell us what was the basis for your opinon * * * that there was no malpractice in this case?"

The court would not allow him to state his opinion except by way of explanation. In response to the question, the witness testified: "It was made on the basis of a * * * thorough review of the medical records. It was also made on the basis of the material that was presented to the panel by all the members who appeared before the panel and it was also made on the basis of the discussions that were held by the panel itself after the presentation between the members of the panel, and the opinion was based on the fact that there was no deviation from standard acceptable medical practice."

Plaintiff called Dr. Palladino, the pathologist panelist. Counsel for plaintiff asked Dr. Palladino whether, as a pathologist, he looked at slides to determine whether they had a free edge or a soft edge. The doctor responded that this would be done

where a cancerous or suspected cancerous lesion was involved. Counsel asked Dr. Palladino what his reading of the slides was. An objection was sustained on the ground that it was entering the province of the panel hearing itself.

On cross-examination by counsel for defendants Bodean, Kahn and Bromberg, Dr. Palladino stated that he could not remember having seen the slides from the surgery at the Hospital for Special Surgery where the amputation took place. However, he was familiar with the contents of the report. Counsel then asked what the slides showed. Objection was made by plaintiff's attorney and sustained.

Counsel for the said defendant doctors then began to inquire into the basis of Dr. Palladino's opinon:

"Q. What was the basis of your opinion, doctor?

"A. I examined the slide from all procedures as listed previously, and except for the amputation specimen, I did not make a diagnosis, either of epithelial sarcoma or of any kind of cancer on the material I examined.

"THE COURT: Your opinion was based on an objective evaluation?

"THE WITNESS: Yes, your Honor.

"Q. You saw the latest slide from special surgery?

"A. I saw a slide.

"Q. A slide?

"A. Yes.

"Q. Were you able to make a diagnosis based on that slide?

"MR. TURKEWITZ [counsel for plaintiff]: Objected to.

"THE COURT: Sustained.

"Q. You just told us what you saw on a previous one. That wasn't my question. My question was not answered, was not responsive to my question.

"THE COURT: I'll sustain the objection.

"MR. YOUNG: Then your Honor, I move to strike the answer as not responsive, the previous question.

"THE COURT: All right, it will be stricken accordingly. Now, the answer purports to deal with an epithelial sarcoma and I will direct that it be stricken. If that's what you want, you've got it.

"MR. YOUNG: Well, I would like to approach the bench, your Honor, on this line of questioning.

"THE COURT: Come up, gentlemen."

(Whereupon, an off-the-record discussion was held at the bench.)

"THE COURT: I will permit you to ask that question.

"MR. YOUNG: As to the opinion?

"THE COURT: Yes."

On cross-examination by counsel for defendant Sims, the following questions as to the basis of Dr. Palladino's opinion were permitted:

"Q. Doctor, with regards to the slides, you gave a previous answer with regards to the basis of your opinion, with regards to the North Shore slides. Will you tell us what the basis of your opinion was?

"A. I examined the slides and all of them, presumably all of them, trying to decide whether a diagnosis of any kind of cancer could be made on the slides. I didn't know what the course or the route of the trial was going to take, and I thought as a pathologist, I asked for the slides myself so I wouldn't have to make my opinion based on other people's examinations. I thought it would be worthwhile to decide —

"MR. TURKEWITZ: Could the Court please—I object to his giving an answer in this form.

"MR. PITTONI [counsel for defendant Sims]: That is the very basis of his opinion.

"MR. TURKEWITZ: It is not being responsive. I have no objection to the reinstatement of the answer that was given which your Honor said should be stricken.

"MR. PITTONI: This is the basis of his opinion, and under the law this is exactly the area I want to go into.

"THE COURT: Go ahead. I'll permit him to answer. Continue. Go ahead.

"A. I asked for the slides and I received the slides, and I asked myself what may I be asked concerning this case, what could I contribute to this case as a member of the panel, and I decided that I could try to accomplish two goals. One, there was, I had seen the diagnosis and letters among all those concerned, and the term 'epithelioid sarcoma' was in all kinds of reports, and I decided could I make the diagnosis of such a tumor, and I could not. Since it seemed important to me—."

Plaintiff maintains that the trial court's limitation on questioning of the physician panelists was error. We disagree. In

support of her argument plaintiff relies on *Curtis v Brookdale Hosp. Center* (62 AD2d 749, 755), wherein this court reversed the trial court's ruling that a medical panel member's testimony must be limited to a recital of the witness' qualifications and a statement setting forth the recommendation of the panel, holding: "Thus, it follows that the recommendation is admissible in evidence at the trial and that both parties may interrogate the physician member with reference to the recommendation, whether the recommendation is favorable or unfavorable to the party calling the witness. The purpose and emphasis of the interrogation will, of course, differ between the parties, depending upon the complexion of the recommendation. Nevertheless, both the clear language of the statute and the evident legislative intent supporting its enactment are an unmistakable direction that either party may call the physician member of the panel as a witness with reference to the recommendation. The extent and duration of the examination of the witness will, of course, be subject to the discretion of the court, which should be properly exercised."

*Curtis* found that the language of section 148-a of the Judiciary Law has a definite and precise meaning. *(Id.,* p 754.) Either party shall have the right to call the physician member of the panel as a witness and to interrogate him concerning the basis of the panel's recommendation. Such questioning will involve more than a mere recitation of the recommendation itself. *(Id.,* p 753.) It may include, *inter alia,* inquiry into the physical evidence examined, and documentary evidence reviewed. *Curtis,* therefore, clearly established a right of inquiry of a physician panelist, but recognized its scope as strictly limited.

Accordingly, we disagree with our dissenting brother, who concedes that eliciting a panelist's expert opinion testimony per se is unauthorized by section 148-a of the Judiciary Law. Thus, to allow a medical member of the malpractice panel to testify as to his opinion as if he were an independent medical witness called by either side would constitute an expansion of this section far beyond the intent of the legislative scheme which gave rise to its enactment, and as interpreted by *Curtis v Brookdale Hosp. Center (supra).*

LAZER, J. P. (dissenting). The central issue on this appeal concerns the limitations which may be imposed upon examination of physician members of a malpractice panel called to testify as witnesses at the malpractice trial. Subdivision 8 of

section 148-a of the Judiciary Law relevantly provides that: "If the recommendation [of the panel] is read to the jury or by the trial court, the doctor member or the attorney member of the panel, or both of them, may be called as a witness by any party with reference to the recommendation of the panel only."

In the one case which casts illumination on the problem— *Curtis v Brookdale Hosp. Center* (62 AD2d 749)—the plaintiff called the panel physician as a witness in order to have him elucidate the panel's favorable recommendation. When the *Curtis* trial court limited the witness' testimony to a recital of his qualifications and a bare statement of the panel's recommendations of liability, this court reversed. Writing for the majority, Mr. Justice Hopkins declared (p 755) that "[t]he sole reservation to the untrammeled examination of the physician * * * member of the panel is that [his] testimony shall be adduced 'with reference to the recommendation of the panel only' ". The conclusion was (p 755) that: "[B]oth parties may interrogate the physician member with reference to the recommendation, whether the recommendation is favorable or unfavorable to the party calling the witness. The purpose and emphasis of the interrogation will, of course, differ between the parties, depending upon the complexion of the recommendation. Nevertheless, both the clear language of the statute and the evident legislative intent supporting its enactment are an unmistakable direction that either party may call the physician member of the panel as a witness with reference to the recommendation. The extent and duration of the examination of the witness will, of course, be subject to the discretion of the court, which should be properly exercised."

Here, the fact situation differs somewhat because the panel recommendation favored the defendants, but it was the plaintiff who called the two panel doctors in a palpable effort to diminish the effect of the negative determination upon the jury.

In my opinion, the restrictions imposed by the trial court were unduly onerous. Once it is accepted that the examination of a panelist may extend beyond the mere restatement of the panel's conclusion, counsel, friendly or hostile, may plumb the factual and medical basis for the conclusion. When the adversely affected party challenges the underpinnings of the recommendation, excessive restrictions on the scope of the questions will severely strain the right to a fair trial.

At the outset of the examination of the first panel doctor called, the trial court declared that the doctor "cannot testify with regard to his opinion, what happened during the course of that panel hearing." While this rubric subsequently was not adhered to strictly, the limitations imposed upon plaintiff's questioning deprived her of a fair trial.

Thus, when plaintiff's counsel asked:

"Q. What is the medical basis for your opinion in this case?

"THE COURT; You are directed not to answer."

Ultimately, when a defense counsel asked a similar question as to the basis "for your opinion for your finding that there was no malpractice in this case", the witness was permitted to answer in conclusory fashion that he had reviewed the medical records, the material presented, discussed it with the other members "and the opinion was based on the fact that there was no deviation from standard acceptable medical practice."

Examination of the record reveals that the court repeatedly sustained objections to questions which sought to elicit the factual and medical basis for the individual panel member's conclusions. In essence, if limiting the panelist to a mere statement that the panel had recommended one way or the other is error as held in *Curtis,* the instant rulings that the witness could not be obligated to say more than that the recommendation was based on a review of the records and a discussion among the panel members also render the interrogation illusory. In reaching my conclusion, I am aware that some of plaintiff's questions went afield and were properly precluded. Nevertheless, a number of other questions which legitimately probed the foundation for the recommendation also were excluded. I see no merit in plaintiff's other claims of error.

Accordingly, I dissent and vote to reverse the judgment and remand for a new trial.

COHALAN and O'CONNOR, JJ., concur with MANGANO, J.; LAZER, J. P., dissents and votes to reverse the judgment insofar as appealed from and to grant a new trial, with an opinion.

Judgment of the Supreme Court, Nassau County, entered June 22, 1978, affirmed insofar as appealed from, with one bill of costs payable jointly to respondents appearing separately and filing separate briefs.